SEVERY PROCESS CO. et al. v. HARPER & BROS.

(Circuit Court, S. D. New York. January 30, 1902.)

1. PATENTS—CONSTRUCTION OF CLAIMS—SUCCESS OF DEVICE.

When the question of infringement depends upon the construction of the claims, the court, in the endeavor to find out what it is that the inventor has given to the world, is justified in considering the invention as measured by the success achieved, and where the alleged infringer has taken the "last step," and has attained the first commercially successful solution of the problem, care should be taken to protect him to the extent of his actual invention.

2. SAME—IMPROVER OR INDEPENDENT INVENTOR.

Claims of a patent should not be so broadened by construction as to include devices which, though accomplishing the same function, do so by new combinations, operating upon principles so different as to entitle their originator to be considered as an independent inventor.

3. SAME—INFRINGEMENT—PLATEN FOR PRINTING PRESS.

The Severy patent, No. 549,691, for a bed or surface for platens for printing presses, composed of a number of fixed, independently yielding bristles or wires, cannot be so broadly construed as to cover the device

of the Allen patents, Nos. 613,217–613,221, in which the bed or blanket consists of fine wire coils, interlocked and held in place between two sheets of rubber, which are not "independently yielding," and especially in view of the fact that the Severy device has never been commercially successful, owing to its cost, while the Allen device was immediately successful.

In Equity. Suit for infringement of patent. On final hearing.

William Houston Kenyon, for complainants.

Frederick P. Fish and Charles Neave, for defendants.

COXE, District Judge. This is an equity action for the infringement of letters patent, No. 549,691, granted November 12, 1895, to Melvin L. Severy for an improvement in platens for printing presses. The object of the invention is to produce a uniform impression without the previous preparation of the platen, impression-cylinder, or type, known in the art as the "make-ready." This is accomplished by providing under the covering of the platen, or its equivalent, a surface "formed by the ends of a number of fixed, independently yielding, and elastic wires or bristles, or their equivalents, arranged in close proximity to one another and smoothed off evenly, whereby a yielding surface is formed which accommodates itself to irregularities in the printing surface and to varying thicknesses in different parts of the material upon which the impression is to be made." The inventor describes the "make-ready" of the prior art as a tedious, expensive and unsatisfactory process, requiring skilled labor and wearing out the type. The substitution of the patented bed or surface for the "make-ready" removes all these disadvantages. The inventor likens the surface which he uses to the independently yielding bristles of an ordinary hairbrush, but he does not limit himself to this particular means of producing it. He illustrates different methods of reaching the same result by bending, in various ways, elastic wires placed in close proximity to one another, and having their free ends ground off to form a perfectly flat surface. He says:

"The finer the wires and the closer their proximity to one another the better will be the result attained. Fine 'card clothing,' so called, illustrates the desired proximity of the wires and the evenness of the surface."

The claims are as follows:

"1. A bed or surface for platens for printing presses and the like composed of a number of fixed, independently yielding, elastic bristles or wires, substantially as set forth.

"2. A bed or surface for platens for printing presses and the like composed of a number of fixed, independently yielding, elastic bent wires or bristles, substantially as set forth."

The defense of noninfringement is the only one argued.

The defendant's device is described in and protected by five letters patent, granted to Arthur S. Allen, all being dated October 25, 1898. It consists of a series of fine wire coils, interlocked, and held in place between two thin sheets of rubber. The upper and lower portions of the coils are imbedded in the rubber, the crests standing out for an infinitesimal distance from the rubber. To the underside of the coils is attached a sheet of woven fabric which

adheres to the rubber and rests on the platen. When in use a stiff paper board, known as "fibrelyn," is laid on top of the device, sheets of manila paper are laid on the top of the "fibrelyn" and between the sheets forms of paper, corresponding to the old "make-ready" are frequently placed, then comes the paper upon which the impression is to be made.

Considered from a practical and commercial point of view two propositions are incontestably established by the proof. First. That the complainants' blanket is a lamentable failure. Second. That the defendant's blanket is a pre-eminent success. The Severy patent has been in existence for over six years and as late as October, 1900, the complainants had not succeeded in producing a successful commercial blanket. At that time they had, apparently, abandoned the device as shown in the specification and drawings and were experimenting with a blanket consisting of a thin sheet of brass perforated with parallel cuts about three-quarters of an inch long, uniformly distributed over the brass sheet which is to be backed by a blanket of rubber. This device was lauded by the complainants' representatives as being incomparably superior to the "old bent wire arrangement" and is asserted by them to be within the Severy patent, although, upon a casual examination of the exhibit in evidence, the assertion seems a most extravagant one. In short, with unlimited capital, with "no lack of brains or money," with ample time and every facility for making a favorable impression, the promoters of the Severy blanket have made a complete failure in their efforts to have it adopted by the printing trade. Printers have examined it, tried it, experimented with it and rejected it. The fact of the complete commercial failure of the patented device is not denied, but the excuse is made that it was impossible to procure the necessary wire or a machine that would weave it into the desired fabric. At least $50,000 has been, it is said, expended in endeavoring to develop a practical commercial blanket, but without success. The blanket is too thick to be used on cylinder presses and too expensive for practical purposes. As complainants' counsel says in the brief:

"The blankets which were made were very expensive, and had to be treated as precious things, as they certainly were."

It is not denied that it is possible to construct the Severy blanket; that numbers of them have been constructed; that cylinder presses can be cut down to fit them, and that they are capable of doing excellent work, but the expense and difficulty of making them seems prohibitive. Theoretically they are a success; practically they are a failure. The old "make-ready" also did excellent work; the only difficulty with it was the expense. It is apparent, therefore, that no substitute for "make-ready" can be popular and successful which offers no advantages in the way of cost. The defendant's blanket, though it was not put on the market until the autumn of 1898, was successful from the start. Large numbers of the devices are in actual use in various printing establishments and are paying royalty to the manufacturer, the Tympalyn Company. The defendant alone

is paying annually $12.50 per square foot on over a hundred square feet of the material.

Of course, it is not asserted that the failure and success of these devices, respectively, should be considered by the court if the patentee is clearly entitled to a broad claim covering the use of wire in every form as applied to a platen bed. It frequently happens that improvements are made in patented structures and methods by subsequent patentees, but this does not give these patentees the right to use the broad invention, neither has the broad inventor the right to use the subsequent improvements. When, however, the question of infringement depends upon the construction of the claims, the court, in the endeavor to find out what it is that the inventor has given to the world, is justified in considering the invention as measured by the success achieved. "In the law of patents it is the last step that wins." The last step in this art has certainly been taken by Mr. Allen and it is the step that has won. In such circumstances care should be taken not to reward the one who is still wandering in the realms of theory at the expense of the man who has actually solved the problem.

To quote again from the Barbed Wire Patent, 143 U. S. 275, 283, 12 Sup. Ct. 443, 446, 36 L. Ed. 154, 158:

"It may be strange that, considering the important results obtained by Kelly in his patent, it did not occur to him to substitute a coiled wire in place of the diamond shaped prong, but evidently it did not, and to the man to whom it did ought not to be denied the quality of inventor. There are many instances in the reported decisions of this court where a monopoly has been sustained in favor of the last of a series of inventors, all of whom were groping to attain a certain result, which only the last one of the number seemed able to grasp."

Claims should not be so broadened by construction as to include devices which, though accomplishing the same function, do so by new combinations operating upon principles so different as to entitle their originator to be considered as an independent inventor.

The case of Westinghouse v. Power-Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136, is instructive upon this subject. A pioneer patent was held not to be infringed by the defendant's device, because the latter, though within the letter of the claims, departed from the principle of the patent and solved at once and in the most simple manner the problem in question. At page 568, 170 U. S., page 722, 18 Sup. Ct., page 1147, 42 L. Ed., the court says:

"The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted when he has done nothing in conflict with its spirit and intent. 'An infringement,' says Mr. Justice Grier in Burr v. Duryee, 1 Wall. 531, 572, 17 L. Ed. 650, 658, 'involves substantial identity whether the identity be described by the terms, "same principle," same "modus operandi," or any other. * * * The argument used to show infringement assumes that every combination of devices in a machine which is used to produce the same effect is necessarily an equivalent for any other combination used for the same purpose. This is a flagrant abuse of the term equivalent."

And, again, at page 573, 170 U. S., page 724, 18 Sup. Ct., page 1149, 42 L. Ed.:

"Although Mr. Boyden may have intended to accomplish the same results, the Westinghouse patent, if he had had it before him, would scarcely have suggested the method he adopted to accomplish these results. Under such circumstances, the law entitles him to the rights of an independent inventor."

In Campbell Printing-Press & Mfg. Co. v. Duplex Printing-Press Co. (C. C.) 86 Fed. 315, the court, at page 320, says:

"It is contended by the complainant that Kidder is entitled, under his patent, to claim, broadly, a printing machine having either vertical or horizontal type beds. Assuming that his combinations were patentable, which to me admits of some doubt, in view of the state of the art, and the facts that his machine is scarcely an improvement in the art, and certainly not a commercial success, that its capacity did not exceed that of presses then in use, and it failed to meet the demands of the trade for expedition and cheapness, while the defendant's machine has met with a large sale and prints more than three times as rapidly as Kidder's, while but one of the latter has been put in use since the issue of the patent in 1884, a radical difference in operation and mechanism between the Kidder machine and that of the defendant is strongly, if not conclusively, suggested." See, also, Jensen v. Norton, 12 C. C. A. 324, 64 Fed. 599, 603; Howell Torpedo Co. v. E. W. Bliss Co. (C. C.) 111 Fed. 907, 916.

There is nothing in the patent to indicate that Severy ever contemplated any other surface than that produced by the ends of bristles, the ends of wires, the ends of teeth sawed from sheet steel or the ends of other similar material. In every instance the free ends of the elastic bristles, wires, or teeth, when smoothed off evenly, form the surface. These wires, etc., may be straight or bent in various ways, but always it is the ends which receive the printing pressure, each end being an independently yielding unit. It is this novel characteristic which distinguishes the Severy blanket from the prior art, which shows rubber surfaces having independently yielding rubber springs and areas. In short, it is the brush-like formation which is described in the specification and is distinctly pointed out in the claims. The first claim is for a bed or surface composed of a number of bristles or wires which must have the following characteristics: First. They must be fixed vertically. Second. Their lower ends must be fixed in a backing. Third. Their upper ends must be free. Fourth. They must yield independently of each other. Fifth. Their free ends must form the printing surface. The second claim is similar, except that it specifically covers bent wires or bristles. Even allowing for a wide range of equivalents it is thought that the claims cannot be expanded to cover structures which operate upon a different principle and do not possess any one of the above-mentioned characteristics. Where it is manifest that a claim is limited to certain features it is not material whether such limitation was or was not necessary. See cases cited in Safety Oiler Co. v. Scovill Mfg. Co. (C. C.) 110 Fed. 203.

As before stated, the defendant's bed consists of a series of fine, interlaced wire coils laid horizontally between two sheets of rubber. the summits of the coils being imbedded in the rubber. There are no bristles and nothing approximating thereto. There are no wires

having a fixed lower end and a free upper end. There are no vertical wires or bristles with their free ends for the printing surface. There are no independently yielding wires, in the sense that the Severy wires are independent. The resiliency or elasticity of the patented structure is of a very different character from that produced by a fabric made of fine wire coils laid on their sides and backed and faced by rubber. In the one case the pressure falls upon a surface made of the ends of independent wires, there being from 600 to 1,300 points to the square inch; in the other it falls upon a composite surface, the coils of wire being continuous, interacting and reacting. It requires little expert knowledge to perceive that the yield and recovery of a straight or slightly bent wire from pressure applied to one end must be quite different from the action of a coiled spring lying upon its side, the pressure being applied to the crest of one of the turns, and that the difference must be more marked as the coils and wires are, respectively, increased. To adopt the language of Mr. Livermore:

"The separate turns of a coil in defendant's tympalyn have no individual existence, but are essentially a co-operative part of the continuous coil, and the turns are not independently yielding in the sense that any turn may yield without affecting, and without being affected by, the condition of the adjoining turns. * * * Neither are the turns of wire, structurally or functionally, equivalent to the bristles or wires of the Severy blanket, nor is the tympalyn blanket as a whole, composed of the intermeshing wire coils, an equivalent for the Severy blanket as a whole composed of a brush or comb-like structure."

When in addition to the structural differences referred to it is remembered that pressure reaches the coils through a thick, stiff paper board, which cannot be depressed in small areas, the impossibility of independent, individual action of the crests will be readily perceived.

Mr. Severy, in describing his experiments, says: "No one bristle had any possible means of knowing what another one was doing," but when pressure is applied to any given point of "fibrelyn" not only is the crest directly beneath the point of pressure informed, but so are all the crests in the immediate vicinity. Each knows immediately what the others are doing and assumes its share of the load.

It is unnecessary to pursue the discussion further.

The court has devoted considerable time to the study of the record and finds it impossible to escape the conviction that it will not only be an injustice to the defendant and its licensors, but to the public as well, to compel them, and future improvers also, to pay tribute to the Severy patent. The patent cannot fairly be given the wide scope insisted on. It may be that means will yet be discovered to make the patented blanket a commercial success. When this time arrives it is highly probable that its characteristic features will make it popular for high class printing, but there is no reason why it should monopolize the entire field. Each of the devices in controversy has advantages peculiarly its own. There is room enough in the art for both.

The bill is dismissed.